CRAIG CARPENITO
United States Attorney
JANE DATTILO
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102
Tel. (973) 645-2780
Email: jane.dattilo@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOUIS N. GALLO, III,<br><br>    *Petitioner*,<br><br>  v.<br><br>WARDEN, FCI FORT DIX,<br><br>    *Respondent.* | Hon. Renée Marie Bumb, U.S.D.J.<br><br>Civil Action No. 20-16416 (RMB) |

---

**ANSWER TO 28 U.S.C. § 2241 PETITION FOR WRIT OF HABEAS CORPUS**

---

               CRAIG CARPENITO
               UNITED STATES ATTORNEY
               *Attorney for Respondent*

JANE DATTILO
Assistant United States Attorney

## <u>TABLE OF CONTENTS</u>

Table of Contents.................................................................................i

Table of Authorities..........................................................................iii

Preliminary Statement........................................................................1

Statement of Facts.............................................................................3

    I.    Gallo's Conviction and Imprisonment at Fort Dix............................3

    A. In April 2020, The BOP Decided Not to Transfer Gallo to  Home Confinement Based On His Criminal History...........................................3

      B. Gallo's COVID-19 Infection and Subsequent Medical History.......4

    II.    The Instant Petition..........................................................5

    III.    FCI Fort Dix and The Bop's Response to COVID-19 .....................5

    A. FCI Fort Dix .................................................................5

    B. BOP's "Action Plan" to Combat The Spread of COVID-19 ............6

    C. BOP's Enhanced Cleaning Protocols and Quarantine Units...........8

    D. COVID-19 Conditions at FCI Fort Dix................................13

    IV.    BOP's Use Of Home Confinement to Combat COVID-19...............16

    V.    Earned Time Credits Under The First Step Act .............................20

    VI.    Gallo's Programming at FCI Fort Dix................................27

    VII.    Gallo's Failure to Exhaust Administrative Remedies....................28

Argument ..................................................................................................30

   I. The Bop Properly Exercised Its Discretion By Deciding Not to
Transfer Gallo to Home Confinement Based On His Criminal History ...30

     A. Gallo Failed To Exhaust Administrative Remedies With
Respect to His Home Confinement Claims and Earned Time Credit.......31

     B. This Court Lacks Jurisdiction To Review The BOP's
Home Confinement Decisions, Which Are Committed to
Agency Discretion By Statute.....................................................................35

     C. The BOP Denied Gallo's Request For Home Confinement Based
On His Criminal History, Not Because of His PATTERN Score .............35

     D. Gallo Is Not Entitled to Earned Time Credits .................................36

   II. Continued Incarceration Does Not Violate Gallo's Eighth
Amendment Rights .....................................................................................38

     A. Gallo Failed to Exhaust His Administrative Remedies With
Respect to His Conditions of Confinement Claims....................................38

     B. This Court Lacks Jurisdiction Over Gallo's Conditions of
Confinement Claim.....................................................................................39

     C. Gallo's Conditions of Confinement Do Not Violate
The Constitution .........................................................................................45

Conclusion ................................................................................................49

## <u>TABLE OF AUTHORITIES</u>

### <u>Federal Cases</u>

*Aigebkaen v. Warden, FCI Fort Dix, No. 20-5732 (NLH),*
    2020 WL 6883438 (D.N.J. Nov. 24, 2020) .................................................. 35, 43, 47

*Arias v. U.S. Parole Comm'n,*
    648 F.2d 196 (3d Cir. 1981) ............................................................................... 32, 33

*Bonadonna v. United States,*
    446 F. App'x 407 (3d Cir. 2011) ............................................................................... 40

*Briley v. Warden Fort Dix FCI,*
    703 F. App'x 69 (3d Cir. 2017) ................................................................................. 32

*Brown v. Grondolsky,*
    No. 09-3290 (RMB), 2009 WL 2778437 (D.N.J. Aug. 31, 2009) ............................ 33

*Cardona v. Bledsoe,*
    681 F.3d 533 (3d Cir. 2012) ...................................................................................... 40

*Crawford v. Bell,*
    599 F.2d 890 (9th Cir. 1979) ..................................................................................... 41

*Defoggi v. United States,*
    No. 20-3889 (NLH), 2020 WL 2899495 (D.N.J. June 3, 2020) .................................. 4

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ................................................................................................... 45

*Furando v. Ortiz,*
    No. 20-3739, 2020 WL 1922357 (D.N.J. Apr. 21, 2020) .......................................... 35

iii

*Gambino v. Morris*,
134 F.3d 156 (3d Cir. 1998) ..................................................................... 33

*Goodman v. Ortiz*,
No. 20-7582 (RMB), 2020 WL 5015613 (D.N.J. Aug. 25, 2020) ........................ 1, 38

*Helling v. McKinney*,
509 U.S. 25 (1993) ..................................................................................... 45

*Herring v. Joseph*,
No. 20-249, 2020 WL 3671375 (N.D. Fla. June 22, 2020) ...................................... 22

*Hope v. Warden York Cty. Prison*,
972 F.3d 310 (3d Cir. 2020) ........................................................................ 43

*Johnson v. Hoy*,
227 U.S. 245 (1913) ................................................................................... 42

*Johnson v. Warden Canaan USP*,
699 F. App'x 125 (3d Cir. 2017) ................................................................. 41

*Johnson v. Zickefoose*,
Civ. No. 12-2544 RMB, 2012 WL 5880344 (D.N.J. Nov. 20, 2012) ............ 35, 36, 37

*Leamer v. Fauver*,
288 F.3d 532 (3d Cir. 2002) ........................................................................ 40

*Leslie v. Att'y Gen. of United States*,
363 F. App'x 955 (3d Cir. 2010) ................................................................. 40

*Mathisen v. Ortiz*,
No. 18-1435 (NLH), 2020 WL 5640715 (D.N.J. Sept. 22, 2020) ............................ 33

iv

*McGee v. Martinez,*
  627 F.3d 933 (3d Cir. 2010) .................................................................................... 40

*Medina v. Choate,*
  875 F.3d 1025 (10th Cir. 2017) .............................................................................. 42

*Moore v. DeYoung,*
  515 F.2d 437 (3d Cir. 1975) .................................................................................... 42

*Moscato v. Fed. Bureau of Prisons,*
  98 F.3d 757 (3d Cir. 1996) ...................................................................................... 31

*Murphy v. Brooks,*
  132 F.3d 43 (10th Cir. 1997) .................................................................................. 41

*Nelson v. Campbell,*
  541 U.S. 637 (2004) ........................................................................................... 40, 41

*Preiser v. Rodriguez,*
  411 U.S. 475 (1973) .................................................................................................. 41

*Prows v. Fed. Bureau of Prisons,*
  981 F.2d 466 (10th Cir. 1992) ................................................................................ 35

*Reese v. Warden Philadelphia FDC,*
  904 F.3d 244 (3d Cir. 2018) .................................................................................... 42

*Ross v. Blake,*
  136 S. Ct. 1850 (2016) ............................................................................................. 39

*Stanko v. Obama,*
  393 F. App'x 849 (3d Cir. 2010) ............................................................................ 40

*Steading v. Thompson,*
 941 F.2d 498 (7th Cir. 1991) ................................................................. 45

*Thomas v. Tice,*
 948 F.3d 133 (3d Cir. 2020) .................................................................. 45

*Valentine v. Collier,*
 956 F.3d 797 (5th Cir. 2020) ................................................................ 39

*Vasquez v. Strada,*
 684 F.3d 431 (3d Cir. 2012) .................................................................. 31

*Velez v. Zickefoose,*
 No. 10-3992 (NLH), 2010 WL 5186158 (D.N.J. Dec. 15, 2010) ............................ 33

*Woodall v. Fed. Bureau of Prisons,*
 432 F.3d 235 (3d Cir. 2005) .................................................................. 40

*Woodford v. Ngo,*
 548 U.S. 81 (2006) ............................................................................ 32

*Wragg v. Ortiz,*
 462 F. Supp. 3d 476 (D.N.J. 2020) ....................................... 1, 39, 44, 47

## Federal Statutes

8  U.S.C. § 3632(d)(4)(A) ..................................................................... 37
18 U.S.C. § 3621 ............................................................................... 20
18 U.S.C. § 3621(b) ....................................................................... 19, 44
18 U.S.C. § 3621(h)(1)-(2) ................................................................. 22
18 U.S.C. § 3621(h)(1)(A) .................................................................. 22
18 U.S.C. § 3624(c)(2) ...................................................................... 35
18 U.S.C. § 3632 .............................................................................. 23
18 U.S.C. § 3632(a) ..................................................................... 21, 25
18 U.S.C. § 3632(a)(3) ...................................................................... 36
18 U.S.C. § 3632(d) .......................................................................... 27
18 U.S.C. § 3632(d)(4) ...................................................................... 27

18 U.S.C. § 3635 ........................................................................... 37

18 U.S.C. § 3635(3) ...................................................................... 27

28 U.S.C. § 2241 ............................................................... 31, 39, 40

42 U.S.C. § 1997e(a) .................................................................... 38

## **Federal Regulations**

28 C.F.R. § 542.10 ........................................................................ 28

28 C.F.R. § 542.13 ........................................................................ 29

28 C.F.R. § 542.14(a) ................................................................... 29

28 C.F.R. § 542.15(a) ................................................................... 29

28 C.F.R. § 542.18 ........................................................................ 29

## PRELIMINARY STATEMENT

Respondent David Ortiz, warden of the Federal Correctional Institution in Fort Dix, New Jersey ("FCI Fort Dix"), respectfully submits this memorandum of law in opposition to the petition for a writ of habeas corpus brought by petitioner Louis N. Gallo, III. Gallo, a federal inmate at FCI Fort Dix, seeks release to home confinement on the grounds that: (1) the BOP has wrongly denied him home confinement based on its withholding of Earned Time Credit; and (2) the conditions of his confinement at FCI Fort Dix violate the Eighth Amendment prohibition on cruel and unusual punishment.

First, Gallo has failed to exhaust his administrative remedies as to any of his claims. This Court can dismiss his Petition on this ground alone.

Second, this Court should not order Gallo transferred to home confinement. The BOP acted within its discretion to deny Gallo's request for home confinement based on his criminal history, which includes both an offense involving violence and a violation of supervised release. Moreover, Gallo is not entitled to any Earned Time Credit, as he has not completed eligible courses in his Needs areas. Gallo's reliance on *Goodman v. Ortiz*, No. 20-7582 (RMB), 2020 WL 5015613 (D.N.J. Aug. 25, 2020), is misplaced, because that decision addressed when—not whether—the BOP should apply Earned Time Credits.

Finally, Gallo's challenges to his conditions of confinement do not warrant his transfer to home confinement. As this Court held in *Wragg v. Ortiz*, 462 F. Supp. 3d 476 (D.N.J. 2020), conditions of confinement claims are not cognizable on habeas

1

review.  Moreover, BOP's extensive preventative measures, described herein, along with Gallo's own medical records, demonstrate that the BOP has not acted with deliberate indifference to Gallo's risk of infection or medical needs.

STATEMENT OF FACTS

## I.     Gallo's Conviction and Imprisonment at Fort Dix

On October 20, 2014, the District Court for the Southern District of Florida sentenced Gallo to 168 months of imprisonment for mail and wire fraud, followed by three years of supervised relief.  *United States v. Gallo*, 12-cr-20630, Judgment, ECF No. 405 (S.D. Fla. Oct. 20, 2014).  As discussed in further detail below, Gallo is housed in the minimum security Camp at FCI Fort Dix.  Declaration of James Reiser, dated November 24, 2020 ("Reiser Decl.")) ¶ 48.

### A.  In April 2020, the BOP Decided Not to Transfer Gallo to Home Confinement Based on His Criminal History

Despite Gallo's allegations in the Petition, the BOP has never approved Gallo for home confinement or moved him to pre-release quarantine.  Petition at 2, 11.  Reiser Decl. ¶ 22.  On April 17, 2020, a Unit Team at Fort Dix recommended against placing Gallo in home confinement because a court had revoked his supervised release in 2011, and because he had been convicted of Transmitting Threats to Injure in 2005.  Reiser Decl. ¶22 & Ex. 1, Home Confinement Denial Memorandum.  Accordingly, FCI Fort Dix declined to exercise its discretion to place Gallo in home confinement.  Reiser Decl. ¶ 22.  The BOP did not base this determination on Gallo's PATTERN score.[1]  *Id.*

---

[1] "Prisoner Assessment Tool Targeting Estimated Risk and Needs.  According to the BOP's website, '[t]he risk and needs assessment system is used to determine the risk and needs of inmates in BOP custody.  Specifically, the system determines the recidivism risk of each inmate and assigns a recidivism risk score of minimum, low,

3

### B. Gallo's COVID-19 Infection and Subsequent Medical History

On April 22, 2020, Gallo tested positive for COVID-19, during an outbreak of the disease at the Camp.  Turner-Foster Decl. ¶ 2; Reiser Decl. ¶ 26.  Gallo showed no COVID-19 symtoms at the time of testing and remained asymptomatic during the entire period of his infection.  Turner-Foster Decl. ¶¶ 3-4.  Based on his positive test, the BOP moved Gallo to medical isolation in housing unit 5851.  Reiser Decl. ¶ 27.  During this time, he was seen daily by medical staff, including by two physicians.  Turner-Foster Decl. ¶ 3.  He transferred from medical isolation to recovery after seven days, during which time daily medical evaluations ceased, but medical care remained available had Gallo developed symptoms.  *Id.* at ¶4.  After Gallo tested negative for COVID-19 twice, BOP staff moved him back to the Camp in June 2020.  *Id.* ¶ 5; Reiser Decl. ¶ 48. There have been no additional COVID-19 cases at the Camp since this time.  *Id.* ¶ 28.

Since his release back to the Camp, Gallo has sought medical care on only one occasion: October 22, 2020, when he complained that his left leg and right arm had been falling asleep for six weeks.  *Id.* ¶ 6.  He reported no other symptoms or complications, and medical staff made no abnormal findings upon evaluation.  *Id.*

---

medium, or high risk. The system also assesses each inmate and determines, to the extent practicable, the inmate's risk of violent or serious misconduct.'"  *Defoggi v. United States*, No. 20-3889 (NLH), 2020 WL 2899495, at *2 (D.N.J. June 3, 2020), *reconsideration denied*, No. CV 20-3889 (NLH), 2020 WL 4013456 (D.N.J. July 16, 2020) (internal citation omitted).

Medical staff directed Gallo to increase his fluid intake, including by purchasing sports drinks from the Commissary.  *Id.*

Medical staff also ordered routine blood work at the October 22 visit.  *Id.* at ¶¶ 6-7.  This request for blood work has not been fulfilled as of November 24, 2020.  *See* Foster-Turner Decl., Ex. 1 (medical records).  According to Dr. Foster-Turner, "[b]ased on [Gallo's] normal medical evaluation, there is no concern in the delay in obtaining blood work."  *Id.* ¶ 7.  "If the issue was of an urgent nature, the medical provider would have labeled it an 'urgent' priority."  *Id.*

## II. The Instant Petition

Gallo filed the instant emergency petition for habeas corpus on November 18, 2020.  He seeks transfer to home confinement on two grounds.  First, he alleges that the BOP wrongfully denied him transfer to home confinement based on the erroneous refusal to grant him Earned Time Credit under the First Step Act.  Second, he argues that his continued confinement violates the Eight Amendment due to the BOP's deliberate indifference to his medical needs and his risk of reinfection with COVID-19.  This Court has ordered the Government to respond on an expedited basis.  ECF No. 2, Order to Answer.

## III. FCI Fort Dix and the BOP's Response to COVID-19

### A. FCI Fort Dix

FCI Fort Dix is a "low security federal correctional institution with an adjacent minimum security satellite camp."  FCI Fort Dix Homepage, available at https://www.bop.gov/locations/institutions/ftd/ (last visited Nov. 24, 2020).  FCI Fort

Dix Low "is made up of buildings formerly used as military training and housing." Reiser Decl. ¶ 24.  "The Low security institution has an East and West Compound, separated by razor wire fencing."  *Id.*  Each individual housing unit in the East and West compounds has military-style dormitories.  *Id.*  The Low facility has a capacity of approximately 4,700 inmates and currently has a population of approximately 2,600 inmates.   *Id.* ¶ 25.  Inmates generally do not leave their individual housing unit at this time.  *Id.* ¶ 24.

Gallo is housed in the minimum security Camp. Reiser Decl. ¶ 48.  The Camp is located outside of the fenced in Low facility.  *Id.*  ¶ 24.  The Camp has a capacity of approximately 400 inmates, but is currently running at less than half-capacity, with a population of approximately 170 inmates.  *Id.* ¶ 25.

### B.    BOP's "Action Plan" to Combat the Spread of COVID-19

Since January 2020, to combat the spread of COVID-19 at its institutions, BOP has been coordinating with subject-matter experts at multiple organizations and agencies, including the World Health Organization and the Centers for Disease Control ("CDC").  *BOP  COVID-19  Action  Plan*,  available  at https://www.bop.gov/resources/news/20200313_covid-19.jsp  (last  visited  Nov.  24, 2020).   Because of these ongoing efforts, BOP implemented a multi-phased operational plan called the "Action Plan."  *See BOP Modified Operations*, available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Nov. 24, 2020).  The Action Plan seeks to "mitigate the spread of COVID-19" among inmates and staff,

continue effective operations of the federal prison system, and ensure that staff remain healthy and available for duty.  *Id.*

"Beginning August 5, 2020, BOP implemented Phase 9 of the Action Plan, which currently governs operations." Reiser Decl. ¶ 23(a). Under Phase 9, "[o]nly limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access." *Id.* "Further, BOP has limited the movement of inmates and detainees among its facilities."  *Id.*

All staff and inmates receive "an appropriate face covering and [are] strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved."  *Id.* ¶ 23(b).  "In areas with sustained community transmission, such as FCI Fort Dix, and at medical centers, all staff are screened for symptoms." *Id.* ¶ 23(d).  "Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone."  *Id.*

"Every newly admitted inmate, including inmates transferring to an institution from another BOP facility, is screened and tested for COVID-19 exposure and symptoms."  *Id.* ¶ 23(c) & Ex. 2 (COVID-19 Testing for Transferring Inmates). "The newly admitted inmates are placed in a 14-day quarantine and must test negative prior to releasing to general population."  *Id.*  "Symptomatic or positive inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation."  Reiser Decl. ¶ 23(c).

7

"Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.,* medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems." Reiser Decl. ¶ 23(e). "All volunteer visits are suspended absent authorization by the Deputy Director of BOP." *Id.* "Any contractor or volunteer who requires access will be screened for symptoms and risk factors." *Id.*

"Social and legal visits were stopped as of March 13, 2020, to limit the number of people entering the facility and interacting with inmates." *Id.* ¶ 23(f). "Legal visits have since commenced in a very limited manner and only after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors." *Id.* Limited social visiting re-commenced on October 3, 2020, under certain limitations. *Id.* However, as discussed further below, visitation is again suspended currently in light of recent COVID-19 cases. *Id.* ¶ 46.[2]

## C.   BOP's Enhanced Cleaning Protocols and Quarantine Units

In addition to the Action Plan, BOP adopted proactive cleaning protocols at FCI Fort Dix early in the pandemic, which were overseen in part by Adam Sassaman. Declaration of Adam Sassaman[3] ("Sassaman Decl.") ¶ 5. Mr. Sassaman is the Safety

---

[2] Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp (last visited Nov. 24, 2020).

[3] The BOP prepared the Sassaman Declaration for use in a different case, and the declaration bears that case caption. Other than Paragraph 34, however, which the Government has redacted, the Sassaman Declaration is equally relevant to this case.

and Occupational Health Administrator at FCI Fort Dix. *Id.* ¶ 1. He has worked for BOP for more than ten years and began working in the field of Safety and Occupational Heath for BOP in February 2020. *See id.* ¶ 3. Safety and Occupational Health is a division in BOP "that, in coordination with the separate Health Services division, implements programs and policies to promote a safe, healthy environment for staff and inmates." *Id.* ¶ 2. The following is a chronological summary of the enhanced cleaning protocols for which Mr. Sassaman was in part responsible:

"On March 13, 2020, FCI Fort Dix ordered 300 hand soap dispensers for inmate areas." *Id.* ¶ 8. "To provide for personal hygiene prior to receipt and installation of soap dispensers, FCI Fort Dix issued inmates, at no cost to them, all-in-one soap to shower and wash hands." *Id.* "During this period, inmates also had access weekly to commissary, where they could purchase additional hygiene products, including hand soap and hand sanitizer." *Id.* FCI Fort Dix also issued staff health screening guidance and commenced screening staff for COVID-19. *Id.* ¶¶ 10-11. "This screening is conducted by the separate Health Services division and involves temperature checks and a review of any recent symptoms that could be related to COVID-19." *Id.*

On March 18, 2020, Mr. Sassaman "prepared updated COVID-19 cleaning and disinfection procedures for FCI Fort Dix for review and approval by the Executive Staff, including the Warden." *Id.* ¶ 13. These procedures were approved two days later "and sent to all staff with instructions to train inmate orderlies on implementation." *Id.* ¶ 14. Mr. Sassaman also "sent cleaning and disinfection

9

guidance to all inmates at FCI Fort Dix through the Trulincs electronic communications system." *Id.* ¶ 15; *accord* Ex. 3 (memo to inmate population). Additionally, BOP informed all inmates and staff on March 20, 2020 "that the facility was implementing Modified Operations, including identifying smaller groupings of inmates than previously used and adjusted 'move time' schedules for these smaller groups to help limit contact between inmates." *Id.* ¶ 16.

During the week of March 22, 2020, FCI Fort Dix received hand soap and hand soap dispensers, and BOP staff installed this soap and dispensers "in all inmate bathrooms." *Id.* ¶ 17. Since then, BOP has "continuously" supplied "[a]ll inmate bathrooms" with soap. *Id.* In addition to this soap, on March 24, 2020, staff at FCI Fort Dix distributed EPA-registered disinfectant to housing units, which had been ordered on March 17, 2020. *Id.* ¶ 12. This disinfectant has a "2-minute effectiveness time from contact with the virus." *Id.* BOP instructed staff to "disinfect all frequently-touched surfaces" and "train orderlies on use of the product." *Id.* ¶ 12.

On April 2, 2020, Mr. Sassaman "prepared updated COVID-19 cleaning and disinfection procedures for review and approval by executive management, which were approved the next day, April 3, 2020, and sent to all staff with instructions to train inmate orderlies on implementation." *Id.* ¶ 21; *accord* Ex. 4 (e-mail from Mr. Sassaman regarding updated cleaning procedures).

On April 6, 2020, Mr. Sassaman updated FCI Fort Dix's "institutional Housekeeping Plan to incorporate the April 3, 2020 updated procedures." *Id.* ¶ 22 and Ex. 5. "Since this date, inmate orderlies have been assigned tasks under the

10

Pandemic Disinfecting Procedures in the Housekeeping Plan." *Id.* "The Pandemic Disinfecting Procedures outlined in the Housekeeping Plan indicate that telephones require sanitation after each use and other shared frequently touched surfaces require disinfection hourly." *Id.* ¶ 22.  BOP also "placed disinfection instructions and disinfectant for staff use in all BOP escort vehicles" on April 8, 2020.  *Id.* ¶ 24.

On April 16, 2020, Mr. Sassaman "sent an email memorandum to all staff to remind them to verify and document all cleaning and disinfection efforts, consistent with BOP policy." *Id.* ¶ 25.  He also informed staff that the CDC "would begin to conduct a twice-daily census 'during which all Department Heads, Supervisors, or their designees will call into control to verify the attached sanitation procedures are being undertaken in the housing units and all other areas of the Institution.'" *Id.* & Ex. 6.  Additionally, BOP had provided all inmates and staff with masks, and BOP made using masks mandatory by April 16, 2020.  Reiser Decl. ¶ 7.

"On April 21, 2020, FCI Fort Dix installed dilution centers for the EPA-registered, 45-second disinfectant in the [Camp]." Sassaman ¶ 26.  Mr. Sassaman "advised these facilities to begin using this disinfectant in backpack sprayers immediately with labeled spray bottle use to follow." *Id.* "Other EPA-registered disinfectants remain constantly available for routine cleaning and disinfecting." *Id.*

"On April 24, 2020, FCI Fort Dix modified the documentation requirements for cleaning and disinfection so that Department Heads report once daily to the Command Center that disinfection and cleaning in their area is completed as required." *Id.* ¶ 27.  Staff at FCI Fort Dix also "installed dilution centers for the EPA-

11

registered, 45-second disinfectant in Safety East and West Units." *Id.* ¶ 28.   Mr. Sassaman "advised these facilities to begin using this disinfectant in backpack sprayers immediately with labeled spray bottle use to follow." *Id.* "As noted above, other EPA-registered disinfectants remain constantly available for routine cleaning and disinfecting." *Id.*

Since implementing these cleaning protocols in the March-April timeframe, "FCI Fort Dix has always maintained an adequate stock of sanitation supplies." *Id.* ¶ 31.  In summary, FCI Fort Dix staff have ordered approximately:

- 38,000 gallons of Ready to Use HDQC2 (an EPA registered COVID disinfectant with a 10 minute sanitizing time);

- 6,400 gallons of Ready to Use Ecolab Peroxide Multi-Surface Cleaner and Disinfectant (an EPA registered COVID disinfectant with a 45 second sanitizing time);

- 1,700 gallons of hand soap for inmate areas;

- 225 gallons of Ready to Use TB-cide Quat (an EPA registered COVID disinfectant with a 2 minute sanitizing time); and

- 177 gallons of Ready to Use Oxivir 1 (an EPA registered COVID disinfectant with a 1 minute sanitizing time).

*Id.*

"These supplies are available to all inmate living quarters as needed," and "[t]here is no limit to the supply a housing unit may receive." *Id.* Additionally, "FCI Fort Dix inmates have had continued access to institution-supplied hand soap, disinfectant, and towels, as well as sanitary items available for purchase from the Commissary." *Id.* ¶ 30.

In connection with enhanced cleaning protocols and resources, BOP established a number of quarantine units at FCI Fort Dix with associated health and safety protocols. *Id.* ¶ 32; Reiser Decl. ¶ 30-311. "In accordance with BOP guidance, inmates are quarantined when symptoms warrant, an inmate newly arrives at FCI Fort Dix, an inmate is releasing from FCI Fort Dix to the community, or an inmate is transferring to or from another Institution." Sassaman Decl. ¶ 32. "FCI Fort Dix has instituted separate quarantine locations on each Compound for self-surrender and transfer inmates, releasing or transferring inmates, and symptomatic inmates." *Id.* "Inmates from the quarantine unit are not ordinarily permitted to leave the unit and have their food delivered to them." *Id.* "To the extent practicable, staff members also limit going between the quarantine unit and the general population in order to avoid possible contamination." *Id.* "Staff entering the quarantine or isolation units must wear additional Personal Protective Equipment (PPE)." *Id.*

### D.    COVID-19 Conditions at FCI Fort Dix

As described above and in the declarations, BOP and the staff at FCI Fort Dix began no later than February 2020 to prepare for the worldwide coronavirus pandemic and have continued to modify and update their operations. Their multifaceted efforts have not entirely prevented infections at the facility, but such efforts have allowed BOP to manage positive cases and provide appropriate medical care when such cases arise.

In April and May 2020, the Camp had an outbreak of COVID-19 in which fifty-eight inmates housed in the Camp, including Gallo, tested positive. Reiser Decl. ¶

26; Turner-Foster Decl. ¶ 2.  The BOP moved Camp inmates who tested positive for COVID-19, and only those inmates who tested positive for COVID-19, into housing unit 5851 on the West Compound for medical isolation and quarantine.  Reiser Decl. ¶ 27.  All fifty-eight Camp inmates recovered by June 2020, and inmates moved back into the Camp after it was professionally sanitized by a contracted company.  *Id.* ¶¶ 27-28.  There have been no additional COVID-19 cases at the Camp since this time. *Id.* ¶ 28.

At some point after the Camp outbreak, the BOP directed transfers of inmates from FCI Elkton in Ohio to FCI Fort Dix in order to improve social distancing at FCI Elkton.  Reiser Decl. ¶ 29.  FCI Fort Dix established a special quarantine location with associated protocols for these FCI Elkton transfers to bar immediate interaction with the general population until they cleared quarantine.  *Id.* ¶ 29.  FCI Fort Dix received a transfer of sixty-four FCI Elkton inmates on September 28, 2020, six of whom tested positive for COVID-19 and were placed in medical isolation.  *Id.* ¶ 35. On October 6, 2020, another sixty-five FCI Elkton inmates arrived at FCI Fort Dix, six of whom tested positive for COVID-19 and were placed in medical isolation.  *Id.* ¶ 36.  All twelve COVID-19 positive transfers have since recovered from their infections.  *Id.* ¶ 38.

On October 21, 2020, ninety-two FCI Elkton inmates, none of whom tested positive for COVID-19, arrived at FCI Fort Dix.  *Id.* ¶ 37.  The last transfer from FCI Elkton occurred on October 28, 2020, when seventy-seven inmates arrived at FCI Fort Dix, five of whom tested positive for COVID-19 and were placed in medical

14

isolation. *Id.* ¶ 39. Those five subsequently recovered, though six more of the October 28 transferees who were on quarantine status subsequently tested positive and were placed in medical isolation. *Id.*

Concurrent with the recent surge in COVID-19 cases nationwide, FCI Fort Dix has experienced a substantial number of recent positive tests in specific sections of the facility. As of November 24, 2020, apart from the FCI Elkton transfers, FCI Fort Dix has 240 additional positive cases, as follows: [4]

> Specifically, there are currently 7 Special Housing Unit ("SHU") inmates positive for COVID-19. 222 inmates from housing unit 5812 also tested positive for COVID-19 after all 231 inmates in the housing unit were COVID tested on a multitude of occasions. One of the positive inmates was granted a Compassionate Release and immediately released on November 4, 2020. Therefore, there are a total of 221 current positive inmates from unit 5812. On November 16, 2020, one inmate from the Camp quarantine release unit (5735) tested positive, and on November 11, 2020, 11 inmates from unit 5841 tested positive.

Reiser Decl. ¶ 41.

In October and November, twenty-one staff members have tested positive. *Id.* ¶ 42. Those staff members have remained out of facility until medically cleared. *Id.* Currently, eight positive staff members remain out of the prison. Contrary to Gallo's allegations, Petition at 9, no inmates have died at FCI Fort Dix. *Id.* During the week of November 16, 2020, FCI Fort Dix began to test staff to screen for possible asymptomatic cases on a volunteer basis. *Id.* ¶ 43.

---

[4] Respondent acknowledges that these data may change. Accordingly, Respondent will update the Court upon request and when making future filings on this matter.

FCI Fort Dix has implemented further protocols in response to these positive cases on top of the Phase 9 protocols directed by BOP. *Id.* ¶ 44. On October 15, 2020, the Warden suspended all visitation. *Id.* ¶ 45. Inmate movement is minimized to eliminate or decrease interactions between individuals from different housing units. *Id.* Extensive sanitation procedures remain in place. *Id.* ¶ 47.

## IV.  BOP's Use of Home Confinement to Combat COVID-19

BOP is also addressing COVID-19 by prioritizing home confinement for "at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." Mar 26, 2020 Attorney General Memorandum for the Director of BOP, available at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf (last visited Nov. 24, 2020); *see also* Reiser Decl. ¶ 3-4.[5] In making this determination, BOP "consider[s] the totality of circumstances for each individual inmate" based on the following non-exhaustive, discretionary factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with [CDC] guidelines;

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

---

[5] Further information regarding BOP's home confinement procedures and policies can be found in BOP Program Statement 7320.01, Home Confinement, available at https://www.bop.gov/policy/progstat/7320_001_CN-1.pdf (last visited Nov. 24, 2020).

- The inmate's conduct in prison, with inmates who have engaged in violent or gang related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment[;]

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety[;] and

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community[.]

*Id.* at 1-2.

While considering these factors, the Attorney General emphasized that BOP "cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways." *Id.* at 2. Accordingly, any inmate granted home confinement under this guidance was required to be "in a mandatory 14-day quarantine period" before being "discharged from a BOP facility." *Id.* "Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release." *Id.*

On April 3, 2020, the Attorney General updated his guidance to BOP and issued additional directives in light of the passage of the CARES Act. April 3, 2020 Memorandum, https://www.justice.gov/file/1266661/download (last visited Nov. 24, 2020). The CARES Act authorized the Attorney General "to expand the cohort of inmates who can be considered for home release upon [his] finding that emergency

17

conditions are materially affecting the functioning of [BOP]." *Id.* The Attorney General also identified specific BOP facilities "experiencing significant levels of infection," which did *not* include FCI Fort Dix. *See id.* at 1-2 (identifying FCI Oakdale, FCI Danbury, and FCI Elkton).

The CARES Act expanded the authority for BOP to review "all at-risk inmates -- not only those who were previously eligible for transfer." *Id.* at 2. But this expanded authority did not override BOP's obligation to protect public safety. *See id.* "That means [BOP] cannot simply release prison populations en masse onto the streets." *Id.* "Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses." *Id.* As the Attorney General explained, the "last thing" the public needs right now is the "indiscriminate release" of inmates without "careful, individualized determinations":

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

*Id.* at 3.

"BOP has generally prioritized for home confinement those inmates who have served a certain portion of their sentences, or who have only a relatively short amount of time remaining in those sentences." Reiser Decl. ¶ 20. "While these priority factors are subject to deviation in BOP's discretion in certain circumstances and are subject to revision as the situation progresses, BOP is at this time prioritizing for consideration those inmates who either (1) have served 50% or more of their sentences, or (2) have 18 months or less remaining in their sentences and have served 25% or more of their sentences." *Id.* "As BOP processes the inmates eligible for home confinement under these criteria and learns more about the COVID-19 pandemic and its effect on BOP facilities, it is assessing whether and how to otherwise prioritize consideration." *Id.* However, even if the inmate "does not qualify for home confinement under BOP criteria, an inmate may be reviewed for placement in a Residential Reentry Center and home confinement at a later stage in accordance with applicable laws and BOP policies." *Id.* ¶ 21.

Congress's decision to grant the Attorney General and BOP this additional CARES Act authority reflects a long-standing practice of deferring to BOP regarding the transfer and placement of inmates. Under 18 U.S.C. § 3621(b), BOP, not the courts, "shall designate the place of the prisoner's imprisonment" based on an individualized and fact-intensive analysis of the inmate. "Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of

19

imprisonment of that person." *Id.* Furthermore, "a designation of a place of imprisonment under this subsection is not reviewable by any court." *Id.*

Currently, among other factors, the BOP considers the inmate's institutional discipline history for the last twelve months, considers whether the inmate has a verifiable release plan, confirms that the inmate's primary offense is not violent, a sex offense, or terrorism-related, and confirms that the inmate does not have a detainer. Reiser Decl. ¶ 18. In a November 16, 2020 Memorandum, the BOP determined that inmates with violence in their past offenses are ineligible for home confinement. ¶ 19.

Since the March 26, 2020 Memorandum instructed the BOP to prioritize home confinement, the BOP has placed 17,800 inmates in home confinement. COVID-19 Home Confinement Information, https://www.bop.gov/coronavirus/index.jsp (last visited Nov. 24, 2020). "Inmates do not need to apply to be considered for home confinement." Reiser Decl. ¶ 17. "BOP Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General." *Id.* "While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager." *Id.*

## V.   Earned Time Credits Under the First Step Act

The First Step Act of 2018, signed into law on December 21, 2018, amends 18 U.S.C. § 3621, the statute governing the calculation of federal sentences. Among other provisions, the First Step Act required the Attorney General to develop a "risk

and needs assessment system" for federal inmates within 210 days after the law's

enactment.  *See* 18 U.S.C. § 3632(a).  "Risk" refers to the likelihood that each

individual inmate will reoffend or recidivate after release.  *See* Resier Decl., Ex. 16

(First Step Act Approved Programs Guide) at 2.  "Need" refers to the specific areas

an inmate can address to lower his or her risk. *See id.*  In other words, Need indicates

what issues affect an inmate's risk and what he or she should address by taking

programs. *See id.*

In addition, the First Step Act adds the subsections:

(h) IMPLEMENTATION OF RISK AND NEEDS ASSESSMENT SYSTEM.—

(1) IN GENERAL.—Not later than 180 days after the Attorney General completes and releases the risk and needs assessment system (referred to in this subsection as the 'System') developed under subchapter D, the Director of the Bureau of Prisons shall, in accordance with that subchapter— "(A) implement and complete the initial intake risk and needs assessment for each prisoner (including for each prisoner who was a prisoner prior to the effective date of this subsection), regardless of the prisoner's length of imposed term of imprisonment, and begin to assign prisoners to appropriate evidence-based recidivism reduction programs based on that determination;

(B) begin to expand the effective evidence-based recidivism reduction programs and productive activities it offers and add any new evidence-based recidivism reduction programs and productive activities necessary to effectively implement the System; and

(C) begin to implement the other risk and needs assessment tools necessary to effectively implement the System over time, while prisoners are participating in and completing the effective evidence-based recidivism reduction programs and productive activities.

(2) PHASE-IN.—In order to carry out paragraph (1), so that every prisoner has the opportunity to participate in and complete the type and amount of evidence-based

21

recidivism reduction programs or productive activities they need, and be reassessed for recidivism risk as necessary to effectively implement the System, the Bureau of Prisons shall—

(A) provide such evidence-based recidivism reduction programs and productive activities for all prisoners before the date that is *2 years after the date on which the Bureau of Prisons completes a risk and needs assessment for each prisoner under paragraph (1)(A); and*

(B) develop and validate the risk and needs assessment tool to be used in the reassessments of risk of recidivism, while prisoners are participating in and completing evidence-based recidivism reduction programs and productive activities.

18 U.S.C. § 3621(h)(1)-(2) (emphasis supplied).

As noted above, the First Step Act required the Attorney General to develop a risk and needs assessment system within 210 days of the law's enactment.  The Attorney General met this deadline on July 19, 2019, when the BOP released the "Prisoner Assessment Tool Targeting Estimated Risk and Needs" ("PATTERN").  *See Herring v. Joseph*, No. 20-249, 2020 WL 3671375, at *3 (N.D. Fla. June 22, 2020), *report and recommendation adopted in part*, 2020 WL 3642706 (N.D. Fla. July 6, 2020).

The First Step Act also directs the BOP to "implement and complete an initial intake risk and needs assessment for each prisoner" and "begin to assign prisoners to appropriate evidence-based recidivism reduction programs based on that determination" within 180 days of PATTERN's release date (that is, by January 15, 2020.  18 U.S.C. § 3621(h)(1)(A).)

22

The BOP has identified the following "needs" that agency staff should assess for each inmate:

- Anger/Hostility
- Finance/Poverty
- Antisocial Peers
- Medical
- Cognitions
- Mental Health
- Dyslexia
- Recreation/Leisure/Fitness
- Education
- Substance Abuse
- Family/Parenting
- Trauma
- Work

*See* Reiser Decl., Ex. 15 (November 2019 Memo) at 1.  The BOP has also identified a number of screening measures staff may use to assess these needs.  *See id.* at 3-15.

In enacting 18 U.S.C. § 3632, the First Step Act directed the BOP to use the Risk and Needs Assessment to classify inmates at risk of recidivism, match inmates with suitable programs, and offer incentives for completion of such programs, including Earned Time Credit toward pre-release custody.  Specifically, 18 U.S.C. § 3632 provides, in relevant part:

(a) IN GENERAL.—Not later than 210 days after the date of enactment of this subchapter, the Attorney General, in consultation with the Independent Review Committee authorized by the First Step Act of 2018, shall develop and release publicly on the Department of Justice website a risk and needs assessment system (referred to in this subchapter as the "System" ), which shall be used to—

23

(1) determine the recidivism risk of each prisoner as part of the intake process, and classify each prisoner as having minimum, low, medium, or high risk for recidivism;

(2) assess and determine, to the extent practicable, the risk of violent or serious misconduct of each prisoner;

(3) *determine the type and amount of evidence-based recidivism reduction programming that is appropriate for each prisoner and assign each prisoner to such programming accordingly, and based on the prisoner's specific criminogenic needs, and in accordance with subsection (b)*;

(4) reassess the recidivism risk of each prisoner periodically, based on factors including indicators of progress, and of regression, that are dynamic and that can reasonably be expected to change while in prison;

(5) reassign the prisoner to appropriate evidence-based recidivism reduction programs or productive activities based on the revised determination to ensure that—

(A) all prisoners at each risk level have a meaningful opportunity to reduce their classification during the period of incarceration;

(B) to address [1] the specific criminogenic needs of the prisoner; and

(C) all prisoners are able to successfully participate in such programs;

....

(d) EVIDENCE-BASED RECIDIVISM REDUCTION PROGRAM INCENTIVES AND PRODUCTIVE ACTIVITIES REWARDS.—The System shall provide incentives and rewards for prisoners to participate in and complete evidence-based recidivism reduction programs as follows:

...

(4) TIME CREDITS.—

(A) In general.— A prisoner, except for an ineligible prisoner under subparagraph (D), *who successfully completes evidence-based*

24

*recidivism reduction programming or productive activities*, shall earn time credits as follows:

(i) A prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

(ii) A prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

(B) Availability.— A prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed—

(i) prior to the date of enactment of this subchapter; or

(ii) during official detention prior to the date that the prisoner's sentence commences under section 3585(a).

(C) Application of time credits toward prerelease custody or supervised release.—

Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release.  The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), *into prerelease custody or supervised release*.[6]

18 U.S.C. § 3632(a), (d) (emphasis supplied).

The First Step Act defines "Evidence-based Recidivism Reduction

Program" and Productive Activities" as follows:

_____

[6] Earned Time Credit is credit applied toward pre-release placement (*i.e.,* placement in an RRC or home confinement).  Unlike good conduct time, it does not shorten an inmate's sentence by moving up his statutory release date.

25

(3) EVIDENCE-BASED RECIDIVISM REDUCTION PROGRAM.— The term "evidence-based recidivism reduction program" means either a group or individual activity that—

(A) has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism;

(B) is designed to help prisoners succeed in their communities upon release from prison; and

(C) may include—

(i) social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills;

(ii) family relationship building, structured parent-child interaction, and parenting skills;

(iii) classes on morals or ethics;

(iv) academic classes;

(v) cognitive behavioral treatment;

(vi) mentoring;

(vii) substance abuse treatment;

(viii) vocational training;

(ix) faith-based classes or services;

(x) civic engagement and reintegrative community services;

(xi) a prison job, including through a prison work program;

(xii) victim impact classes or other restorative justice programs; and

(xiii) trauma counseling and trauma-informed support programs.
....

26

(5) PRODUCTIVE ACTIVITY.—

The term "productive activity" means either a group or individual activity that is designed to allow prisoner determined as having a minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating, and may include the delivery of the programs described in paragraph (1) [1] to other prisoners.

18 U.S.C. § 3635(3), (5).

The BOP has approved a number of Evidence-Based Recidivism Reduction ("EBRR") program and "Productive Activities" ("PAs") that may qualify for First Step Act credits.  *See* Reiser Decl., Ex. 16 (First Step Act Approved Programs Guide) at 4-42.  To receive Earned Time Credit under the First Step Act, an inmate must successfully complete one of the BOP-approved EBRR programs or PAs related to one of the particular needs assigned to that inmate.  *See* Reiser Decl. ¶ 53.  The BOP list of approved EBRR programs and PAs also sets out the duration that constitutes "completion" of the program/activity as required by 18 U.S.C. § 3632(d)(4).  *See* Reiser Decl., Ex. 16 (First Step Act Approved Programs Guide) at 4-42.

## VI.    Gallo's Programming at FCI Fort Dix

On December 2, 2019, BOP staff found Gallo eligible to earn Earned Time Credits under 18 U.S.C. § 3632(d) because he did not have a disqualifying offense under the statute.  *See* Reiser Decl. ¶ 49, Ex. 14 (Inmate History – FSA) at 1.  That same day, BOP staff conducted a Risk and Needs Assessment for Gallo and determined that he had a "Minimum" risk for recidivism.  Reiser Decl. ¶ 50.

27

In May 2020, due to changes to the PATTERN tool, Gallo's PATTERN score increased to a "Low" risk for recidivism.  *See* Reiser Decl. ¶ 50, Ex. 14 (Inmate History – FSA) at 1.  Gallo's PATTERN score reverted to "Minimum" in September 2020, where it remains as of November 24, 2020.  *Id.*

Staff also determined that Gallo had a "Need" in the following categories: Anger/Hostility and Work.  *See* Reiser Decl. ¶ 52, Ex. 14 (Inmate Profile) at 1-2.  Gallo does not have a need for programming in any other category. *See id.*  In June 2020, the BOP placed Gallo on the wait-list for Anger Management in order to meet his need in Anger/Hostility.  *See* Reiser Decl. ¶ 53.  As of November 24, 2020, Gallo had not yet commenced the program.  *See id.*

With regard to Gallo's Work need, in order to receive credit for an occupational training program, he must complete one of the BOP-approved 500-hour programs. Reiser Decl. ¶ 54, Ex. 16 at 22.  He is not participating in any courses at this time that would qualify him for Earned Time Credit.  Reiser Decl. ¶ 54.  Gallo has taken numerous OSHA programs, but these do not qualify him for Earned Time Credit.  *Id.*, Ex. 18, Education Transcript.  Likewise, his completion of the Money Smart program does not qualify him for credit because he does not have a Finance/Poverty need. Reiser Decl. ¶ 54, Exs. 14 & 16.

## VII.  Gallo's Failure to Exhaust Administrative Remedies

BOP has established a four-step process for federal inmates to exhaust administrative remedies.  *See* 28 C.F.R. § 542.10 *et seq.*  To comply with this process, an inmate generally must first attempt to informally resolve his dispute with prison

28

staff. *See* 28 C.F.R. § 542.13.  If these efforts fail, the inmate must then submit a BP-9 administrative remedy request to the warden of his institution within twenty days of the event or decision underlying the request. *See* 28 C.F.R. § 542.14(a), (c).  If the administrative remedy request is denied, the inmate must then file a BP-10 appeal with the appropriate Regional Director within twenty days of the date of the warden's response. *See* 28 C.F.R. § 542.15(a).  If the Regional Director denies the appeal, the inmate must then appeal that decision by filing a BP-11 appeal with the BOP's Central Office, General Counsel, within thirty days from the date of the Regional Director's response. *See id.*  The General Counsel has 40 days to respond.  28 C.F.R. § 542.18.  If an issue raised by the inmate concerns "an emergency" that "threatens the inmate's immediate health or welfare, the Warden shall respond not later than the third calendar day after filing." § 542.18.

According to BOP records, in July 2020, Gallo filed an administrative remedy request with the Warden of FCI Fort Dix challenging the denial of his request to transfer to home confinement. *See* Dobovich Decl. ¶ 4, Ex. 2 (BP-9 Remedy and Response) at 1.  On August 31, 2020, the Warden denied the request, explaining that Gallo was ineligible for transfer to home confinement because:

> Specifically, in 2005, you were convicted of charges to including Transmitting Threat to Injure.  During the commission of your crime, it was determined that you threatened a potential government witness.  Additionally, in June 2011, while on supervised release, you were arrested on a supervised release warrant due to your continued criminal activity.  Based on the aforementioned, your Unit Team determined you posed a safety and

29

security threat to the community should you be released
from custody.

*Id.*

The BOP rejected both of Gallo's attempts to appeal this denial for deficiencies
in his filing. *Id.* ¶ 4, Ex. 3 (Administrative Remedy Generalized Retrieval). Gallo has
never filed any other administrative remedies. Dobovich Decl. ¶ 5. Thus, he has not
challenged the conditions of his confinement regarding his medical care or COVID-
19 risk, or his lack of Earned Time Credit through the administrative remedy process.

## Argument

### I. The BOP Properly Exercised Its Discretion By Deciding Not to Transfer Gallo to Home Confinement Based on His Criminal History

This Court should reject Gallo's challenges to the BOP's decision to deny him
home confinement for at least three reasons. First, Gallo failed to exhaust his
administrative remedies. Second, the BOP's home confinement decisions are
committed to agency discretion, leaving this Court without jurisdiction to review
them. Third, Gallo's claims fail on their merits. Gallo alleges a cascade of errors in
which the BOP's refusal to grant him Earned Time Credit resulted in an erroneous
PATTERN score of Low, which in turn rendered him ineligible for home confinement.
His allegations are incorrect at every step: (1) Gallo has not met the requirements for
Earned Time Credit; (2) the BOP denied him home confinement due to his criminal
history, rather than on the basis of his PATTERN score; (3) and his PATTERN score
is in fact Minimum.

Contrary to Gallo's allegations, the BOP never approved him for transfer to home confinement or moved him to pre-release quarantine.  Reiser Decl. ¶ 22. Instead, on April 17, 2020, a Unit Team at Fort Dix recommended against Gallo's placement in home confinement for two reasons: (1) a Court revoked Gallo's supervised release in 2011; and (2) Gallo was convicted of Transmitting Threats to Injure in 2005.   Reiser Decl. ¶ 22 & Ex. 1, Memorandum.  Accordingly, the BOP declined to exercise its discretion to place Gallo on home confinement.  Reiser Decl. ¶ 22.

### A. Gallo Failed to Exhaust Administrative Remedies With Respect to His Home Confinement Claims and Earned Time Credit

The Court should dismiss Gallo's home confinement and Earned Time Credit claims because he did not exhaust administrative remedies.  Although Gallo initiated the administrative remedy process by challenging the BOP's denial of his home confinement request, he failed to exhaust his administrative remedies.  Furthermore, with respect to his claim that the BOP improperly deprived him of Earned Time Credit, Gallo has pursued no administrative remedy whatsoever.   His home confinement and Earned Time Credit claims can be denied on this basis alone.

Before a federal inmate can seek habeas relief in district court pursuant to 28 U.S.C. § 2241, he must first exhaust his administrative remedies.  *See Vasquez v. Strada*, 684 F.3d 431, 433 (3d Cir. 2012); *Moscato v. Fed. Bureau of Prisons*, 98 F.3d 757, 760-62 (3d Cir. 1996).  As the Supreme Court has recognized, the exhaustion requirement serves a number of critical interests:

> First, exhaustion protects administrative agency authority. Exhaustion gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures.
>
> Second, exhaustion promotes efficiency. Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court. In some cases, claims are settled at the administrative level, and in others, the proceedings before the agency convince the losing party not to pursue the matter in federal court. And even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration.

*Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006) (internal citations and quotation marks omitted).

Courts within this Circuit therefore require an inmate to exhaust administrative remedies because exhaustion promotes these important interests. *See Arias v. U.S. Parole Comm'n*, 648 F.2d 196, 199 (3d Cir. 1981) (noting that Third Circuit has "adhered to the exhaustion doctrine for several reasons: (1) judicial review may be facilitated by allowing the appropriate agency to develop a factual record and apply its expertise, (2) judicial time may be conserved because the agency might grant the relief sought, and (3) administrative autonomy requires that an agency be given an opportunity to correct its own errors") (citation omitted); *see also Briley v. Warden Fort Dix FCI*, 703 F. App'x 69, 71 (3d Cir. 2017). Indeed, although *Woodford* concerned the exhaustion requirement imposed by the Prison Litigation Reform Act, the purposes of exhaustion identified by the Court – protecting agency authority and promoting efficiency – apply equally to habeas petitions. *See Woodford*, 548 U.S. at

93 ("In practical terms, the law of habeas, like administrative law, requires proper exhaustion[.]"); *Arias*, 648 F.2d at 199.

Although the exhaustion requirement may be excused in limited circumstances, such as when exhaustion would be futile, *see, e.g., Gambino v. Morris*, 134 F.3d 156, 171 (3d Cir. 1998), courts routinely enforce the requirement where, as here, there is no compelling justification to excuse the petitioner's failure to exhaust. *See, e.g., Velez v. Zickefoose*, No. 10-3992 (NLH), 2010 WL 5186158, at *3 (D.N.J. Dec. 15, 2010) ("it has been long established that an inmate's unjustified failure to pursue administrative remedies results in procedural default warranting decline of judicial review"); *Brown v. Grondolsky*, No. 09-3290 (RMB), 2009 WL 2778437, at *1-2 (D.N.J. Aug. 31, 2009) (exhaustion requirement "is diligently enforced by the federal courts" and futility exception applies only in "narrowly-defined circumstances") (citation omitted). Where a petitioner argues that his failure to exhaust should be excused due to technical problems or circumstances out of his control, he must allege specific facts that explain why he was completely unable to appeal the denial of his administrative remedy request. *See Mathisen v. Ortiz*, No. 18-1435 (NLH), 2020 WL 5640715, at *4 (D.N.J. Sept. 22, 2020)

Here, Gallo entirely failed to undertake the administrative remedy process with respect to his Earned Time Credit claims. Those claims should be denied for failure to exhaust. With respect to Gallo's challenge to the denial of his request for home confinement, he concedes that he has failed to exhaust his administrative remedies, but argues that the Court should excuse his failure to appeal. Petition at

33

6.    Gallo provides a litany of allegations that BOP staff prevented him from exhausting his administrative remedies.  *See* Petition at 15.  Most, like the claims that Gallo could not obtain forms while in medical isolation in the Spring, would not have ultimately prevented him from pursuing his administrative remedies.  Gallo also alleges that the BOP staff purposely withheld "original duplicate forms" and committed other various, non-specific malfeasance with respect to his administrative remedy process.  *See* Petition at 6-7 ("Regional staff either back-dated responses and rejections to just within the requisite 30 days, or as show in Exhibit 'H-1', not mailing the reply for an unreasonable period of time.")

None of Gallo's excuses justifies his failure to exhaust.  BOP files belie his argument  that he was unable to provide a copy of the denial of his BP-9 form because "no Warden's response existed."  *Id.*, *See* Dobovich Decl., Ex. 2 (showing that the Warden issued a written response on August 31, 2020).  Gallo argues that he mailed a corrected appeal on August 24, 2020, but has never heard back.  Petition at 6.  The BOP has no record of receiving a proper appeal of the denial of Gallo's BP-9 form.  Dobovich Decl. ¶ 4.

The Court should deny habeas relief to Gallo because he did not exhaust administrative remedies with respect to the issues raised in this petition.  Even if Gallo did file an appeal, as he alleges, he did not fully exhaust his administrative remedies prior to bringing this petition.  The Court should therefore find that Gallo's failure to complete the administrative process before bringing this petition precludes

him from obtaining relief.  Because Gallo provides no compelling justification for his failure to exhaust administrative remedies, the Court should dismiss the petition.

**B. This Court Lacks Jurisdiction to Review the BOP's Home Confinement Decisions, Which are Committed to Agency Discretion by Statute**

"Pre-release placement decisions, such as transfers to home confinement, are committed to the BOP's sole discretion." *Aigebkaen v. Warden, FCI Fort Dix*, No. 20-5732 (NLH), 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020) (citing 18 U.S.C. § 3624(c)(2) & *Prows v. Fed. Bureau of Prisons*, 981 F.2d 466 (10th Cir. 1992)).  Rather than circumscribe the BOP's discretion, the CARES Act expands it by increasing the number of inmates who qualify for home confinement under 18 U.S.C. § 3624(c)(2). *Id.* (citing *Furando v. Ortiz*, No. 20-3739, 2020 WL 1922357, at *2 (D.N.J. Apr. 21, 2020)); *cf. Johnson v. Zickefoose*, Civ. No. 12-2544 RMB, 2012 WL 5880344, at *7 (D.N.J. Nov. 20, 2012) (challenges to BOP transfer decisions, such as whether to transfer an inmate to an increased security level or whether to release an inmate from disciplinary segregation,  are "not cognizable in habeas").

The BOP's decision to exclude "inmates with violence in their past offenses" from home confinement eligibility is a valid exercise of the BOP's discretion.  Reiser Decl. ¶ 19.  The BOP properly exercised its discretion in deciding not to transfer Gallo to home confinement based on his past offense for threatening injury, as well as his past violation of the terms of his supervised release.   Reiser Decl. ¶ 22.

**C. The BOP Denied Gallo's Request for Home Confinement Based on His Criminal History, Not Because of His PATTERN Score**

As explained above, the BOP denied Gallo's request for transfer to home confinement because of his prior conviction for threatening violence, as well as his violation of supervised release.  Reiser Decl. ¶ 22.  The BOP did not deny Gallo's request for home confinement based on an erroneous PATTERN score of Low as Gallo alleges.  *Id.*  Instead, the BOP assigned Gallo a Minimum PATTERN score from December 2019 to May 2020, a time period which covers the April 17 decision to deny home confinement.  Reiser Decl. ¶ 50.  Due to changes to the PATTERN tool, Gallo's PATTERN score increased to a "Low" risk for recidivism from May to September of 2020.  *See* Reiser Decl. ¶ 50, Ex. 14 (Inmate History – FSA) at 1.  Gallo's PATTERN score reverted to "Minimum" in September 2020, where it remains as of November 24, 2020.  *Id.*

### D. Gallo is Not Entitled to Earned Time Credits

Gallo is not entitled to Earned Time Credits based on courses he has taken while incarcerated.  While Gallo has completed a number of courses from the BOP, he has not completed any EBRR or PA approved programs that could earn him Earned Time Credit.  Accordingly, he is not entitled to any credits.

Among other measures, the First Step Act directs the BOP to "determine the type and amount of evidence-based recidivism reduction programming that is appropriate for each prisoner and assign each prisoner to such programming accordingly, and based on the prisoner's specific criminogenic needs[.]"  18 U.S.C. § 3632(a)(3).  To comply with this directive, the BOP has established a list of Evidence-Based Recidivism Reduction (EBRR) programs and productive activities

(PAs) that meet the definitions set out in the 18 U.S.C. § 3635.  *See* Reiser Decl., Ex. 16 (First Step Act Approved Programs Guide) at 4-42.  Accordingly, before an inmate can receive Earned Time Credit, he or she must successfully complete EBRR programming or PAs related to one of the specific needs assigned to that inmate.  *See* Reiser Decl. ¶ 53; 8 U.S.C. § 3632(d)(4)(A).  An inmate may obtain 10 days of time credit for every 30 days he successfully participates in the EBBR programming or PA. *See* 18 U.S.C. § 3632(d)(4)(A)(i).

Despite Gallo's assertions, he has not completed any programs for which he can receive Earned Time Credits.  As noted above, the BOP has determined that Gallo has needs in Anger/Hostility and Work.  *See* Reiser Decl., Ex. 4 (Inmate Profile Printout) at 1-2).  Thus, to receive Earned Time Credits, Gallo must complete an EBRR program or PA that addresses those specific needs.  The BOP has recommended Gallo, and placed him on the wait-list for, a class in Anger Management, which will address his Anger/Hostility need (*see id.*).  To date, however, Gallo has not commenced this program.  *See* Reiser Decl. ¶ 53.

Although Gallo has completed a number of courses, none of them is listed as an approved EBRR program or PA by the BOP.  *Compare* Petitioner's Exhibit 1 (Education Data Transcript) *with* Reiser Decl., Ex. 16 (First Step Act Program Guide) at 4-42.  While it is admirable that Gallo has taken a number of courses while incarcerated, he cannot receive Earned Time Credit for completing these courses.

*Goodman*, heavily relied upon by Gallo, is inapposite.  *Goodman* was concerned with when—not whether—the BOP will credit inmates with Earned Time Credit.

37

2020 WL 5015613 at *6.  In sum, because Gallo has not fully completed any approved EBRR program or PA related to his assessed needs, he cannot obtain Earned Time Credit toward pre-release custody.

## II.   Continued Incarceration Does Not Violate Gallo's Eighth Amendment Rights

Gallo has alleged that his conditions of confinement at FCI Fort Dix violate the Eighth Amendment's prohibition on cruel and unusual punishment.  This Court should deny Gallo's Eighth Amendment claim on at least three grounds.  First, Gallo has failed to initiate, let alone exhaust, his administrative remedies.  Second, federal courts do not have habeas jurisdiction over conditions of confinement claims.  And third, Gallo's claims fail on the merits; he cannot establish that BOP staff provided him deficient medical care or are deliberately indifferent to his medical needs.

### A.  Gallo Failed to Exhaust His Administrative Remedies With Respect to His Conditions of Confinement Claims

Under the PLRA, an inmate challenging the conditions of his confinement must exhaust all available administrative remedies. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  This mandatory exhaustion requirement applies to all suits regarding prison life, including inmates raising concerns over COVID-19.  *See, e.g., Nellson v. Barnhart*, No. 20-756, 2020 U.S. Dist. LEXIS 66971, at *13 (D. Colo. Apr. 16, 2020)

("The Court finds that plaintiff has failed to exhaust his administrative remedies before seeking judicial relief" regarding COVID-19.) (citing *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016)); *see also Valentine v. Collier*, 956 F.3d 797, 806 (5th Cir. 2020) (per curiam) (staying injunction because petitioners failed to exhaust administrative remedies).

Because Gallo never filed an administrative remedy request regarding his conditions of confinement, *see* Dobovich Decl. ¶ 5, the Court should dismiss his claims for failure to exhaust. His allegation that he could not obtain an administrative remedy form while in medical isolation in the Spring, *see* Petition at 6, does not excuse his failure to exhaust. Even if the administrative remedy forms were unavailable at that time, Gallo could have filed an administrative remedy upon his release from medical isolation.

### B. This Court Lacks Jurisdiction Over Gallo's Conditions of Confinement Claim

The Court lacks jurisdiction over the petition because Petitioner does not present a "core" habeas claim. Petitioner's claims are effectively the same as those brought in *Wragg*, in which this Court dismissed, on jurisdictional grounds, a Section 2241 petition brought by a putative class of inmates alleging Eighth Amendment violations for unconstitutional conditions of confinement and deliberate indifference arising from the COVID-19 pandemic. *See* 462 F. Supp. 3d at 505. Similarly, in *Harper v. Warden*, Judge Kugler dismissed a Section 2241 petition for lack of jurisdiction premised on "the threat of COVID-19 exposure" to "'medically vulnerable'

inmates at Fort Dix." *Harper v. Warden, FCI Fort Dix*, No. 20-8345-RBK, 2020 U.S. Dist. LEXIS 162005, at *7-8 (D.N.J. Sep. 4, 2020). This Court should likewise dismiss this petition because Petitioner is challenging those same conditions of confinement based on the threat of COVID-19 exposure.

The decisions in *Wragg* and *Harper* adhere to the long established precept that habeas corpus relief under Section 2241 "is available only 'where the deprivation of rights is such that it necessarily impacts the fact or length of detention.'" *Bonadonna v. United States*, 446 F. App'x 407, 409 (3d Cir. 2011) (quoting *Leamer v. Fauver*, 288 F.3d 532, 540 (3d Cir. 2002)). The Third Circuit also permits an inmate to bring a Section 2241 petition to challenge the execution of his federal sentence when BOP is allegedly violating a statute or "BOP's conduct was somehow inconsistent with a command or recommendation in the sentencing judgment." *See Cardona v. Bledsoe*, 681 F.3d 533, 537 (3d Cir. 2012) (discussing *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242 (3d Cir. 2005); *McGee v. Martinez*, 627 F.3d 933, 936-37 (3d Cir. 2010)).

"By contrast, constitutional claims that merely challenge the conditions of a prisoner's confinement, whether the inmate seeks monetary or injunctive relief, fall outside of that core" habeas jurisdiction. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004); *see also Stanko v. Obama*, 393 F. App'x 849, 851 (3d Cir. 2010) (holding that district court properly dismissed prisoner's claims of cruel and unusual punishment and constitutional violations resulting from the seizure of his papers because those claims "clearly fall outside the realm of challenges brought in habeas"); *Leslie v. Att'y Gen. of United States*, 363 F. App'x 955, 958 (3d Cir. 2010) ("To the extent that Leslie

40

attempts to challenge the conditions of his confinement, we agree with the District Court that this habeas corpus petition was not the proper vehicle to raise his claims."); *Johnson v. Warden Canaan USP*, 699 F. App'x 125, 126 (3d Cir. 2017) ("The Court correctly reasoned that Johnson was challenging the conditions of his confinement rather than the execution of his sentence, and thus that habeas corpus was not an available remedy."). Federal prisoners wishing to pursue such claims must use other legal means than habeas.[7]

After all, "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). "[W]here an inmate seeks injunctive relief challenging the fact of his conviction or the duration of his sentence," that claim "fall[s] within the core of federal habeas corpus." *Nelson v. Campbell*, 541 U.S. 637, 643 (2004).

To be clear, the Supreme Court has never ruled out the possibility of a federal inmate challenging his conditions of confinement via a habeas petition. *See Preiser*, 411 U.S. at 499 ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to

---

[7] The "appropriate remedy for such constitutional violations, if proven, would be a judicially mandated change in conditions and/or an award of damages, but not release from confinement." *Davis v. Pa. Dep't of Corrs.*, No. 15-587, 2015 U.S. Dist. LEXIS 137712, at *8 (W.D. Pa. Sept. 11, 2015) (citing *Murphy v. Brooks*, 132 F.3d 43 (10th Cir. 1997) (table)), *R&R adopted*, 2015 U.S. Dist. LEXIS 136918 (Oct. 7, 2015); *see also Crawford v. Bell*, 599 F.2d 890, 891-92 (9th Cir. 1979).

41

remove the restraints making the custody illegal."). But neither the Supreme Court nor the Third Circuit has ever recognized or "delineated the circumstances that might qualify" for such an "exceptional" circumstance. *See Reese v. Warden Philadelphia FDC*, 904 F.3d 244, 246 n.2 (3d Cir. 2018) (discussing conditions of confinement for pretrial detainee); *see also Medina v. Choate*, 875 F.3d 1025, 1029 (10th Cir. 2017) ("If a federal prisoner is ever entitled to relief under § 2241 based on something that happened before trial, *the circumstances are so rare that they have apparently not yet arisen*.") (emphasis added)). And numerous courts in this district have recently recognized "the mere threat of exposure to COVID-19" at FCI Fort Dix is not "such an exceptional circumstance" to warrant habeas jurisdiction. *See Harper*, 2020 U.S. Dist. LEXIS 162005, at *7 (citing *Chaparro v. Ortiz*, No. 20-5272 (NLH), 2020 U.S. Dist. LEXIS 131054, at *7 (D.N.J. July 24, 2020); *Cavigliano v. United States*, No. 20-5949 (NLH), 2020 U.S. Dist. LEXIS 130123, at *5 (D.N.J. July 23, 2020); *Dobson v. Warden*, No. 20-5519 (NLH), 2020 U.S. Dist. LEXIS 126079, at *7 (D.N.J. July 17, 2020)).

Furthermore, the theoretical possibility that an "exceptional circumstance" exists for a post-conviction inmate is even more remote when there is an "orderly" process in place for an inmate to obtain the requested relief. *See Johnson v. Hoy*, 227 U.S. 245, 247 (1913) ("[T]he orderly course of a trial must be pursued and the usual remedies exhausted, even where the petitioner attacks on habeas corpus the constitutionality of the statute under which he was indicted[.]"); *Moore v. DeYoung*,

42

515 F.2d 437, 447 (3d Cir. 1975) (discussing in dicta the possibility that "delay, harassment, bad faith or other intentional activity" could preclude an orderly process)

This Court should not follow *Aigebkaen v. Warden, FCI Fort Dix*, No. 20-5732 (NLH), 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020), which extended the Third Circuit's decision in *Hope v. Warden York Cty. Prison*, 972 F.3d 310 (3d Cir. 2020), to the prison context.    In *Hope*, the Third Circuit held that "extraordinary circumstances" created by the COVID-19 pandemic in March 2020 warranted habeas review of civil immigration detainees' conditions of confinement claims.   *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 324 (3d Cir. 2020).

The prison context is distinguishable from the civil immigration context at issue in *Hope* in a number of meaningful ways.   First, the procedural posture and constitutional protections governing civil immigration detainees are different from those for convicted inmates, such as Petitioner.   The Fifth Amendment protects civil immigration detainees, whereas the conditions of confinement for inmates are governed by the Eighth Amendment.   *See Hope*, 972 F.3d at 325 (3d Cir. 2020). Second, inmates serving criminal sentences (unlike civil immigration detainees) are subject to the Prison Litigation Reform Act ("PLRA").   *See id.* at 333 n.6 (citing 18 U.S.C. § 3626(g)(3)).   The PLRA is generally a "non-starter" for habeas petitioners seeking release based on conditions of confinement, and this Petitioner should not be permitted to use § 2241 to circumvent the limitations imposed by that statute.   *See id.* (noting that "Petitioners' quest for immediate release would have been a non-starter" given the strict procedural prerequisites of the PLRA).

43

In this case, Petitioner does not allege that the BOP violated the terms of his court judgment in carrying out the execution of his sentence. Nor does Petitioner allege that the BOP violated any statute or regulation regarding the fact or duration of his sentence. Moreover, Petitioner cannot demonstrate an exceptional circumstance such that this Court should recognize Section 2241 jurisdiction for a post-conviction inmate to challenge the conditions of his confinement. Rather, the BOP continues to address and mitigate the spread of COVID-19 at FCI Fort Dix. Lastly, there is an "orderly" statutory and regulatory process in place for Petitioner to seek home confinement, and Petitioner has pursued, if not exhausted, his options to seek transfer to home confinement through administrative means through the BOP. Simply put, the facts of this Petition do not present any reason for this Court to fashion a groundbreaking jurisdictional remedy that departs from decades of Third Circuit case law.

Regrettably, there are a number of active COVID-19 cases at FCI Fort Dix, but that still does not create an "exceptional circumstance" creating habeas jurisdiction. *Wragg*, 462 F. Supp.3d at 503-05. Similarly, Petitioner has no constitutional right to a transfer to home confinement. *Johnson*, 2012 WL 5880344, at *7. He likewise enjoys no right on Section 2241 habeas to challenge BOP's decision to transfer inmates from FCI Elkton, which decisions are committed by Congress to the sole discretion of BOP. 18 U.S.C. § 3621(b). Petitioner points to no authority creating federal jurisdiction to mount a challenge to transfers of other federal inmates by BOP. Accordingly, the Court should dismiss the petition for lack of jurisdiction.

44

### C. Gallo's Conditions of Confinement Do Not Violate the Constitution

Petitioner's continued detention does not violate the Constitution.  There is no evidence that the Government is acting with a reckless disregard for Gallo's safety or deliberate indifference to his medical needs.  To demonstrate deliberate indifference regarding medical care, an inmate must show both that: (1) alleged deficiencies in medical care are objectively "sufficiently serious"; and (2) government actors "have a sufficiently culpable state of mind." *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020).

### 1.  Risk of Reinfection

In the context of exposing inmates to risk of disease, a claim must be dismissed if it does not pose a threat that is so severe that it would be "contrary to current standards of decency for anyone to be so exposed."  *Helling v. McKinney*, 509 U.S. 25, 35 (1993).  A plaintiff must also show that BOP "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Stated differently, "neither negligence nor strict liability is the appropriate inquiry in prison-conditions cases."  *Steading v. Thompson*, 941 F.2d 498, 499-500 (7th Cir. 1991).

In this case, there is no evidence that Respondent is acting with deliberate indifference with respect to the exposure to risk of infection.  The BOP is not disregarding the risks posed by COVID-19 to Petitioner or any other inmate.  The BOP has been proactive about seeking to prevent COVID-19 infections at FCI Fort Dix and has worked continually to address infections and limit the spread of the virus

within the facility.  Daily news reports and data from around the world demonstrate how difficult it has been to contain COVID-19, and while FCI Fort Dix has experienced infection, the facility and its staff have performed well under the circumstances.

Petitioner's allegation that the BOP has demonstrated a "deliberately indifferent and reckless response" to the COVID-19 pandemic, Petition at 26, is refuted by the declarations attached to this answer.  Respondent and the staff at FCI Fort Dix have implemented (and continue to modify as conditions change) comprehensive plans to protect inmates, mitigate and eliminate spread, address infections, provide medical screening and treatment, and maximize cleanliness and sanitation.  Contrary to Petitioner's allegation of "at least one death at the . . . institution," Petition at 9, no inmates at FCI Fort Dix have died, and none have been transferred to outside hospitals for care.  Reiser Decl. ¶ 42.  Moreover, Petitioner is housed at the Camp, which has a current population of 170 in facilities with a capacity for approximately 400.  *Id.* ¶ 25.  There have been no COVID-19 cases at the Camp since the spring.  *Id.*  ¶ 28.

With respect to the FCI Elkton transfers, the BOP conducted the transfers to FCI Fort Dix from FCI Elkton for an appropriate purpose (to increase social distancing at FCI Elkton) and in a manner that prioritized testing, screening, and separation of inmate groups.  Reiser Decl. ¶¶ 29, 35-43.

In addition, there is no evidence of any culpable mental state by Respondent or any other BOP staff member. The phrase "deliberate indifference" is not just "legalese," it represents a subjective state of mind which Petitioner cannot show.

Petitioner's speculation that he might be re-infected and his allegation that he has one or more risk factors for COVID-19, including obesity, asthma, and pre-diabetes, Petition at 8, cannot form the basis for an Eighth Amendment claim. As this Court explained in *Wragg*:

> This is not to say that Petitioners do not have genuine fears or concerns. These are worrisome times for sure. The record simply does not support that the Respondents have been deliberately indifferent to the inmates' concerns. That physical distancing is not possible in a prison setting, as Petitioners urge, does not an Eighth Amendment claim make[.]

462 F. Supp. 3d at 509.

## 2. Medical Care

Gallo has alleged that he has received inadequate medical care during the COVID-19 pandemic that continues today. Arguments regarding deficient medical care are "not cognizable in habeas petition and need[] to be brought in a civil rights action." *Aigebkaen*, 2020 WL 6883438, at *5. Gallo's allegations are not only insufficient to meet the deliberate indifference standard, but they are also unsupported by the factual record.

First, Gallo alleges that he received inadequate medical care when he was infected with COVID-19 in April 2020: "No treatment whatsoever was provided, nor was Gallo examined by a physician in the more than two months period of time he

was locked indoors with no fresh air or sunshine." Petition at 2.  The record shows that even though Gallo showed no COVID-19 symptoms at the time of testing or during his entire infection, BOP medical staff examined him on a daily basis in the seven days following his positive COVID-19 test.  *See* Turner-Foster Decl. ¶¶ 3-4. Both Dr. Turner-Foster, a medical doctor and the Clinical Director at FCI Fort Dix, and another FCI Fort Dix physican evaluated Gallo at this time.  *Id.* at ¶¶ 1, 3.  When BOP staff moved Gallo to recovery on April 30, 2020, his daily medical examinations ceased, but medical care remained available to him had he developed any symptoms. *Id.* ¶ 4.

Gallo's allegation that he is experiencing "lingering CoVid effects," for which he is receiving inadequate medical care, is likewise unsupported by the record.  Gallo has sought medical care only once in the months following his asymptomatic infection.  *Id.* ¶ 6.  On October 22, 2020, he complained that his left leg and right arm had been falling asleep for six weeks.  *Id.*  He reported no other symptoms or complications, and there were no abnormal findings upon medical evaluation.  *Id.* Medical staff directed Gallo to increase his fluid intake, including by purchasing sports drinks from the Commissary.  *Id.*  According to FCI Fort Dix's Clinical Director, "[b]ased on [Gallo's] normal medical evaluation, there is no concern" that the routine blood work ordered on October 22, 2020, has not yet been performed.  *Id.* ¶ 7. As medical staff explained to Gallo at his October 22 visit, he may request a sick call at any time if he experiences additional or worsening symptoms.  *Id.*, Ex. 1 (medical records) at 1-4.

48

Gallo's allegations, even if they were true, fall far short of establishing the Respondent's deliberate indifference regarding medical needs, which requires both serious deficiencies in medical care and a culpable state of mind. *Thomas*, 948 F.3d at 138. The factual record shows that Gallo received appropriate treatment for his COVID-19 infection in the Spring, and is currently receiving proper care based on medical evaluation of his reported symptoms. Furthermore, Gallo has access to additional medical care should he need it.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny the petition in all respects.

Respectfully submitted,

CRAIG CARPENITO
United States Attorney

By:    s/ Jane Dattilo
JANE DATTILO
Assistant United States Attorney
Attorneys for Respondent

Dated:   November 30, 2020